IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2026 Session

## STATE OF TENNESSEE v. CHARLES HUBERT RUSSELL

**Appeal from the Circuit Court for Coffee County**
**No. 49,158    William A. Lockhart, Judge**

_____

**No. M2025-00261-CCA-R3-CD**

_____

Defendant, Charles Hubert Russell, was indicted for unlawful possession of a firearm after having been convicted of a felony drug offense. Defendant filed a motion to dismiss the indictment on the grounds that the indicted charge violated the Second Amendment. After the trial court denied the motion, Defendant pled guilty to the indicted charge but reserved the right to appeal a certified question of law pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure pertaining to whether his conviction violated the Second Amendment right to bear arms. After reviewing the entire record, the briefs and oral arguments of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY EASTER, JJ., joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Charles Hubert Russell.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Solicitor General; Craig Northcott, District Attorney General; and Marcus D. Simmons, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

This appeal arises from a traffic stop during which law enforcement found a gun in Defendant's car. On August 2, 2023, Defendant was driving his vehicle with a passenger

in Manchester, Coffee County, when he was stopped for a traffic violation.[1]  The officer who initiated the stop was aware that Defendant was released on parole.  Pursuant to his parole status, Defendant's vehicle was searched.  On the passenger side floorboard was a purse containing a firearm.[2]  Defendant denied the gun belonged to him.  The passenger said the gun belonged to Defendant and that he either put the gun in her purse or directed her to do so.[3]  The passenger had no prior criminal record, but because Defendant had "multiple prior convictions for felony drug offenses," the gun was seized.

Defendant was subsequently indicted for unlawful possession of a firearm after having been convicted of a felony drug offense.[4]  T.C.A. § 39-17-1307(b)(1)(B).  The predicate felony was possession of less than 0.5 grams of methamphetamine with the intent to sell or deliver, a Class C felony.  *Id.* §§ 39-17-434(a)(4), (e)(1); 39-17-417(c)(2)(A).  On November 22, 2024, the State filed a notice of enhanced punishment listing Defendant's five prior felony drug convictions as follows:

| DATE OF CONVICTION | NATURE OF CONVICTION | COURT |
|---|---|---|
| 1.  11/2/2017 | Poss. with Intent to Sell Sch. II Meth < .5 grams (C Felony) | Rutherford Co., Criminal Court Case # 17-CR-77722 |
| 2.  09/29/2016 | Poss. with Intent to Sell Sch. II Meth < .5 grams (C Felony) | Rutherford Co., Criminal Court Case # 16-CR-71483 |
| 3.  09/18/2017 | Poss. with Intent to Sell Sch. II Meth < .5 grams (C Felony) | Wilson Co., Criminal Court Case # 16-CR-804 |
| 4.  05/22/2001 | Sale of Sch. II Cocaine < .5 grams (C Felony) | Wilson Co., Criminal Court Case # 01-0324 |
| 5.  01/23/2002 | Conspiracy to Sell Sch. II Cocaine > .5 grams (C Felony) | Wilson Co., Criminal Court Case # 01-1495 |

---

[1] The record does not indicate the nature of the traffic violation.  Defendant filed a motion to suppress the proof from the traffic stop which was denied.  The denial of the suppression motion is not an issue on appeal.

[2] The affidavit of complaint indicates that the weapon was a .380 handgun.  There is no dispute that this is a prohibited weapon under the statute.  *See e.g.,* T.C.A. § 39-11-106.

[3] Because Defendant pled guilty, the factual dispute regarding ownership is not before us and does not affect the constitutional question presented.

[4] A superseding indictment later charged the same offense but omitted the requirement that it be committed "knowingly."

Defendant then filed a motion to dismiss the indictment, relying on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and claiming that the charged offense violated his Second Amendment right to bear arms. He argued that there was "no historical precedent" for disarming "someone convicted of selling drugs." The State responded that the prohibition on the possession of firearms by felons remains "presumptively lawful" since *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), and that *Bruen* did "nothing to alter the longstanding prohibitions on the possession of firearms by felons." The State argued that "even if" *Bruen* required the trial court to examine Tennessee Code Annotated section 39-17-1307(b) for historical analogue, Defendant could not prevail because the nation's historical tradition supported regulations prohibiting felons from possessing firearms.

At the hearing on the motion, Defendant gave brief testimony concerning his past convictions. He denied that he had any prior "violent" convictions and specifically denied having convictions for assault, murder, robbery, or rape. He agreed that he had "some" prior felony drug convictions. On cross-examination, Defendant acknowledged that he had a 2017 conviction for possession with intent to sell or deliver less than 0.5 grams of methamphetamine in Rutherford County, a Class C felony; a 2016 conviction for possession of methamphetamine in Wilson County, a Class C felony; a 2002 conviction for conspiracy to sell more than 0.5 grams of cocaine in Wilson County, a Class C felony; and a 2001 conviction for sale of cocaine less than 0.5 grams in Wilson County, also a Class C felony. Defendant insisted that a prior charge for felon in possession of a handgun was dropped. However, the State entered as a late-filed exhibit all the above judgments as well as a certified copy of a judgment of conviction from Rutherford County dated September 28, 2016, where Defendant pled guilty to unlawful possession of a weapon after having been convicted of a prior felony drug offense.

Defendant argued that the statute violates the Second Amendment, both facially and as applied to him, especially in light of *Bruen*, which shifted the burden to the State to justify firearm regulations with historical analogues. Defendant claimed that his prior convictions were all drug-related, and did not constitute crimes of violence such as murder, assault, robbery, or rape. He argued that under *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), firearm regulations are unconstitutional when applied to nonviolent felons. Defendant maintained that the State must show a "historical tradition" of disarming people for similar offenses. In response to the State's reply to his motion to dismiss, Defendant argued that historical laws disarming loyalists to the British crown during the Revolutionary War and religious groups such as Catholics, were "irrelevant" and superseded by the subsequent codification of the Second Amendment in the Bill of Rights. Defendant noted that during the founding era, persons convicted of felonies were often executed, and if not executed, were still permitted to own firearms. Accordingly, he argues there was not a historical analogue for disarmament. Defendant addressed the Sixth Circuit

- 3 -

*Williams* case, arguing that because the crime of felon in possession of a firearm requires no showing of "dangerousness," to follow *Williams* would improperly shift the burden of proof to him. Defendant maintained that even under *Williams*, a permanent disarmament was not justified because he had never been found to be "dangerous."

The State acknowledged the historical analogue requirement under *Bruen* but maintained that disarming dangerous individuals aligned with the principles of the Founders. Relying on *Heller*, *United States v. Rahimi*, 602 U.S. 680 (2024), and *Williams*, the State contended that the Founders "would have no problem disarming a person they found to pose a danger to others – to the public." The State argued that Defendant, a felon convicted of drug-trafficking offenses, fell into the category of individuals whose conduct poses a risk of danger to the public and who may therefore be disarmed. To illustrate the risk to public safety from drug trafficking, the State pointed to data from the Center for Disease Control and Prevention showing more than 107,000 overdose deaths nationwide in 2023, and noted that Tennessee law now permits a second degree murder conviction when the sale or delivery of a controlled substance results in the death of another and that possession of methamphetamine can support a child abuse charge when a child is exposed to the drug.[5] The State further argued that if the Founders accepted capital punishment for crimes such as theft, they would not have objected to the lesser punishment of disarming felons convicted of felony drug offenses.

At the conclusion of the hearing, the trial court denied the motion to dismiss, stating that existing laws regarding felons and firearm possession remain valid. The trial court noted the lack of binding precedent and acknowledged the ongoing legal debates surrounding the issue. The trial court also stated that "the legislature has defined the crimes that [Defendant] has pled guilty to as dangerous in [the context of] drug trafficking, and I think *Rahimi* allows you to take guns from people who have done dangerous things or are deemed to be dangerous." In its written order denying the motion to dismiss, the trial court found as follows:

> [T]he law still provides that bans on felon ownership of guns are presumptively constitutional, and adhering to the General Assembly's finding that drug crimes are dangerous felonies, the motion is DENIED.

---

[5] See T.C.A. § 39-13-210(a)(2) ("Second degree murder is: A killing of another that results from the unlawful distribution of any Schedule I or Schedule II drug, when the drug is the proximate cause of the death of the user."); T.C.A. § 39-15-401(d)(1)(A-B) ("Any person who negligently, by act or omission, engages in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment, commits a Class A misdemeanor; except that, if the abused child is eight (8) years of age or less, the penalty is a Class B felony. For purposes of this subdivision (d)(1), a person engages in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment if the person's conduct [is] related to the controlled substance methamphetamine . . .").

- 4 -

At the hearing, Defendant []testified about his criminal history, which consisted of several felony convictions, including several drug- or weapons-related felonies. [Defendant] testified that violence was not involved in those felonies. In light of the testimony that the felonies committed by [Defendant] were not violent, the defense argued that [Defendant] was not dangerous, citing a recent decision from the Sixth Circuit that found the question of character for violence or dangerousness to have some relevance to the historical framework. The defense further argued more generally that American societies at the time of the founding did not bar drug dealers – or even any similar type of criminals, such as smugglers – from owning firearms.

In opposition, the State argued that felons in general at that time in history were put to death, and that a ban on firearms is a less extreme sanction than execution. The State also argued that drug dealing is described in *Williams* as a relatively dangerous occupation, albeit nonviolent.

Ultimately, the Court finds that these arguments about the historical record are largely beside the point, and that the language in *District of Columbia v. Heller* remains in effect – that longstanding regulations such as bans on firearms for felons and the mentally ill are presumed valid. Further, the General Assembly has defined drug felonies as dangerous crimes, and in *United States v. Rahimi*, the [United States] Supreme Court expressly allowed for disarming individuals who are dangerous. For both reasons, the Motion to Dismiss is hereby DENIED.

(internal citations and footnote omitted.)

Following the denial of his motion to dismiss, Defendant entered a best interest guilty plea to unlawful possession of a firearm after having been convicted of a felony drug offense subject to the outcome of the appeal of a certified question. Defendant was sentenced to a three-year, Range I, Class C felony sentence with a release eligibility at eighty-five percent by operation of law. *See* T.C.A. § 40-35-501(y)(1)(A), (v)(2)(B). The three-year sentence was to run consecutively to "all previously imposed sentences."

Defendant reserved the following certified question with the consent of the State and the trial court:

The police initiated a traffic stop of Charles Russell, and based upon his parole status, they searched his vehicle. In the passenger area, in a purse, they located a firearm. The passenger then told police (and would be

expected to testify at trial) that the gun was actually Russell's. Because Russell has prior drug felonies, Russell is therefore charged with Felon in Possession of a Firearm (Prior Drug Offen[s]e), Tenn. Code Ann. § 39-17-1307(b)(1)(B). The facts of the traffic stop were outlined in a hearing on a Motion to Suppress, ultimately denied. Later, Russell separately moved to dismiss the indictment, arguing that the gun charge was unconstitutional whether facially or as-applied. Most notably, Russell cited *New York Rifle & Pistol Association v. Bruen*, which held that gun regulations must comport with the nation's history and tradition of regulating firearms, 142 S.Ct. 2011 (2022), and he contended that no similar laws existed around the time of the nation's founding. In addition, Russell cited *State v. Williams*, 113 F.4th 637 (2024), which held the federal Felon in Possession statute unconstitutional, at least as applied to some felons, if non-dangerous. (The parties introduced Russell's criminal record, which showed that he had prior drug felonies, but no crimes of violence.) The State contested the applicability of these authorities, arguing among other things that a history of putting all felons to death was similar to the modern regulation. Ultimately, the court held that because *Heller v. District of Columbia* had authorized laws against felon ownership of guns, 554 U.S. 570 (2008), and also because the General Assembly had declared drug felonies a dangerous crime and *United States v. Rahimi* had allowed for disarming dangerous persons, 144 S.Ct. 1889 (2024), Tennessee's Felon in Possession law satisfies the Second Amendment. Did the court err in declining to dismiss the gun charge as violating the Second Amendment, for not comporting with the nation's history and tradition of regulating firearms?

This appeal is now properly before the court.

**Analysis**

I. <u>Whether the Certified Question is Dispositive</u>

On appeal, both parties maintain the position that the certified question is dispositive of the case. However, appellate courts are not bound by the agreement of the trial court and the parties and must make "an independent determination that a certified question is dispositive." *State v. Scott*, 619 S.W.3d 196, 203, n.3 (Tenn. 2021) (citing *State v. Dailey*, 235 S.W.3d 131, 135 (Tenn. 2007)); *see also State v. Thompson*, 131 S.W.3d 923, 925 (Tenn. Crim. App. 2003). A certified question is dispositive of the case when resolution of the question leaves the reviewing court with two options: affirm the trial court's judgment or reverse the judgment and dismiss the case entirely. *State v. Wilkes*, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984). Whether a certified question is dispositive is

an issue of jurisdiction which is subject to de novo review. *Scott*, 619 S.W.3d at 203 n.3 (citing *State v. Springer*, 406 S.W.3d 526, 531 (Tenn. 2013)).

Here, Defendant contends that the indictment charging him with unlawful possession of a firearm should have been dismissed because the charged crime violates his Second Amendment right to bear arms and is thus unconstitutional on its face and as applied to him. Because resolution of the question leaves this court with the option of either affirming the trial court's judgment, or reversing the judgment and dismissing the case entirely, we conclude that the certified question is dispositive of the case pursuant to and in compliance with the requirements of Rule 37(b)(2)(A) and is thus properly before the court.

## II. Merits of the Certified Question

The issue before this court is one of first impression in Tennessee: whether Tennessee Code Annotated section 39-17-1307(b), the ("felon-in-possession") statute banning firearm possession by individuals previously convicted of felony drug offenses, violates the Second Amendment. When evaluating the constitutionality of a statute, this court begins with the presumption that "an act of the General Assembly is constitutional" and that we must uphold a statute's validity whenever reasonably possible. *State v. Robinson*, 29 S.W.3d 476, 479-80 (Tenn. 2000) (first citing *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997); and then, *WRG Enters., Inc. v. Crowell*, 758 S.W.2d 214, 215-16 (Tenn. 1988)). However, we review the issue de novo with no presumption of correctness to the lower court's legal conclusions. *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (citing *Hughes v. Tenn. Bd. of Prob. and Parole*, 514 S.W.3d 707, 712 (Tenn. 2017)).

The statute at issue is Tennessee Code Annotated section 39-17-1307(b) which states:

(1) A person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, or firearm ammunition and:

(A) Has been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon; or

(B) Has been convicted of a felony drug offense.

- 7 -

T.C.A. § 39-17-1307(b)(1)(B) (2023).[6]  A conviction under the statute is a Class C felony and is punishable by imprisonment.  *Id.* § 39-17-1307(b)(3); *see e.g., id.* § 40-35-112.

Defendant contends that the felon-in-possession statute violates the Second Amendment because it lacks historical support and imposes an unconstitutional categorical ban on all drug felons without distinguishing between violent and nonviolent felons. Defendant further contends that the trial court erred in denying his motion to dismiss because it relied on *Heller*'s reference to the "presumptive lawfulness" of felon-in-possession statutes when denying the motion rather than applying the framework required by *Bruen*.  The State argues that the felon-in-possession statute is presumptively lawful under *Heller* and fits comfortably within our nation's tradition of firearm regulation as required by *Bruen*.

Defendant challenges the felon-in-possession statute on its face and as applied to him.  The State contends that the felon-in-possession statute is constitutional on its face under *Bruen* and constitutional under the Second Amendment as applied to Defendant.

A facial challenge is the "most difficult challenge to mount successfully," because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Put another way, to prevail on a facial challenge, the State "need only demonstrate that [the challenged regulation] is constitutional in some of its application." *Id.* at 693.  By contrast, an as-applied challenge asserts that the statute is unconstitutional only in the manner it was interpreted and enforced against a particular defendant, based on the concrete facts and circumstances of his case, rather than under any hypothetical applications. *Fisher*, 604 S.W.3d at 397.

The Second Amendment states: "A well[-]regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010) (holding that the Second Amendment applies to the States through the Fourteenth Amendment's Due Process Clause).  Any analysis of the Second Amendment starts "with a strong presumption that the Second Amendment right is exercised individually, and belongs to all Americans." *Heller*, 554 U.S. at 581.  The Second Amendment protects "the right of law-abiding, responsible citizens in defense of hearth and home." *Id.* at 626; *see Bruen*, 597 U.S. at 10 (holding that Second Amendment applies to individual self-defense in public).

---

[6] The felon-in-possession statute was amended after the commission of the crime.  The change in the statute does not affect our analysis.

However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. In *Heller*, the United States Supreme Court held that an individual has a Second Amendment right to possess a firearm in his or her home, thereby ruling Washington D.C.'s firearm statute unconstitutional.[7] *Id.* at 628-36. Although *Heller* did not involve a felon or a felon-in-possession statute, the Supreme Court saw fit to give three specific, "longstanding" lawful limitations on the Second Amendment:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as school and government buildings or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In a corresponding footnote, the Supreme Court further noted, "We identify these presumptively lawful regulatory measures only as examples: our list does not purport to be exhaustive," thus, suggesting that there could be more "presumptively lawful regulatory measures." *Id.* at 627, n.26.

Post *Heller*, some federal circuits faced with constitutional challenges to the federal firearm dispossession statutes relied on the "presumptively lawful" language in *Heller* along with an interpretation of the Second Amendment extending only to "law-abiding responsible citizens" in upholding the federal dispossession regulation. *See Williams*, 113 F.4th at 645-46 (citing the list of cases in federal circuits adopting the *Heller* language on felon-in-possession regulations in rejecting Second Amendment constitutional challenges). A majority of federal circuits applied a two-step means-end intermediate scrutiny test similar to the framework used in First Amendment cases. *Bruen*, 597 U.S. at 18-19 (describing the two-step framework).

In *Bruen*, the Supreme Court struck down New York's century-old law requiring all residents who wished to carry a handgun in public to obtain a license. *Id.* at 1. To secure an unrestricted carry license, an applicant had to demonstrate "proper cause" or "a special need for self-protection distinguishable from that of the general community." *Id.* at 1, 11-12. Applicants unable to demonstrate a "special need" were limited to restricted licenses for hunting, target shooting, employment, or denied a license altogether. *Id.* at 12. To underscore the breadth of the New York law, the Supreme Court noted, "We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need." *Id.* at 70. In *Bruen*, the Supreme Court put an

---

[7] The law at issue in *Heller* required "any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. at 628.

- 9 -

end to the means-end scrutiny test and announced the following framework for analyzing firearm regulation challenges under the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (citation omitted). To meet this burden, the State need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. The Supreme Court recognized that in some cases, the analysis will be "fairly straightforward," while other cases may "require a more nuanced approach" due to "unprecedented societal concerns or dramatic technological changes[.]" *Id.* at 27. "Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28.

The Supreme Court next applied *Bruen*'s framework in *Rahimi*, a case involving a Second Amendment challenge to the federal firearm dispossession statute, clarifying that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26-31). "Why and how the regulation burdens the right are central to this inquiry." *Id.* (citing *Bruen*, 597 U.S. at 2). The dual inquiry focuses on "why" the modern statute and its historical forerunner justified burdening the right to bear arms, and "how" they imposed that burden. *Bruen*, 597 U.S. at 29. Specifically, this dual focus requires an examination of the problem the modern statute and historical forerunner sought to remedy, the circumstances justifying disarmament and whether the disarmament was temporary, categorical, or conditional. *Rahimi*, 602 U.S. at 698-700.

In *Rahimi*, the Supreme Court refined the historical analogue inquiry by clarifying what qualifies as "relevantly similar" historical analogue to support a modern statute. *Id.* at 692. In *Rahimi*, the defendant was indicted under a federal statute prohibiting individuals subject to a domestic violence restraining order from possessing a firearm. *Id.* at 680.[8] The Supreme Court found historical support for the statute from two distinct legal

---

[8] 18 U.S.C. § 922(g)(8) states: "It shall be unlawful for any person who is subject to a court order that includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess . . . any firearm or ammunition." 18 U.S.C. § 922(g)(8)(C)(i)-(ii).

regimes: surety laws and "going armed" or affray laws. *Id.* at 693-98. Together, those legal regimes showed that early American governments disarmed people understood to pose a danger to the public. *Id.* at 698. The firearm dispossession statute was not a carbon copy of either historical regime, but the Supreme Court stressed that an identical match was not necessary. *Id.* at 698. A regulation may survive so long as it is "analogous enough" to its historical predecessors. *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). The Supreme Court reiterated that the Constitution does not require a "historical twin" or "dead ringer" in surveying the nation's tradition of firearm regulation for a modern law to withstand a Second Amendment challenge. *Id.*

Further, in criticizing the Fifth Circuit's approach, the Supreme Court provided guidance to courts confronting facial challenges to the Second Amendment to not focus on "hypothetical scenarios where the [federal dispossession statute] might raise constitutional concerns" but instead to consider "the circumstances in which [the statute] was most likely to be constitutional." *Id.* at 701.

*Rahimi's* emphasis on the "why" and "how" of the historical regulations provides the framework for evaluating Tennessee's statute: whether disarming individuals with felony drug convictions aligns with the founding-era principle of disarming individuals whose conduct posed foreseeable threats to public peace. With these principles in mind, we will address Defendant's facial and as-applied challenges to the felon-in-possession statute.

**Facial Challenge**

First, we must address the impact of *Heller* and whether felon-in-possession statutes are "presumptively lawful." Although *Heller* did not involve a felon or a felon-in-possession statute, the United States Supreme Court has repeatedly stated since *Heller* that felon-in-possession statutes are "presumptively lawful." *See McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons . . .' We repeat those assurances here."); *see Rahimi*, 602 U.S. at 682 (disavowing any suggestion "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of person thought by a legislature to present a special danger of misuse" by citing *Heller*'s assurance about the "presumptive lawfulness" of felon dispossession laws); *see also id.* at 699 (explaining that *Heller* did not create an absolute rule against gun regulations in the home where *Heller* acknowledged that some limits, like keeping guns from felons are still considered "presumptively lawful").

While reshaping the analytical framework, *Bruen* did not disturb this principle. Although the Supreme Court in *Bruen* declined to assure the constitutionality of the felon-

in-possession ban in the majority opinion, several justices made those assurances in their separate opinions. 597 U.S. at 72 (Alito, J., concurring); *id.* at 80-81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (repeating *Heller*'s language about the "presumption of lawfulness" as it pertains to laws that prohibit the possession of firearms by felons); *id.* at 129-30 (Breyer J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on . . . *Heller*'s holding [regarding longstanding prohibitions.]"

Most recently, in *Rahimi*, the Supreme Court reiterated that "longstanding prohibitions" on possession of firearms by convicted felons remain presumptively lawful. 602 U.S. at 682 (disavowing any suggestion "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of person thought by a legislature to present a special danger of misuse" by citing *Heller*'s assurance about the "presumptive lawfulness" of felon dispossession laws); *see also id.* at 699 (explaining that *Heller* did not create an absolute rule against gun regulations in the home where *Heller* acknowledged that some limits, like keeping guns from felons are still considered "presumptively lawful").

However, despite the presumptive lawfulness of felon-in-possession statutes, because neither *Heller* nor the Supreme Court's subsequent decisions in *McDonald*, *Bruen*, or *Rahimi*[9] involved a challenge to a felon-in-possession statute or a defendant who was a felon, we will apply *Bruen*'s framework to evaluate the constitutionality of the felon-in-possession statute for individuals with drug-related felony convictions. *Rahimi*, 602 U.S. at 702 (noting that *Heller*, *McDonald*, and *Bruen* did not attempt a full historical account of the Second Amendment and that *Rahimi* likewise resolved only the narrow question of whether individuals judicially found to pose a credible threat may be temporarily disarmed).

Although *Bruen* instructs courts to begin by addressing whether the individual challenging the statute is part of "the people" whom the Second Amendment protects, *Bruen*, 597 U.S. at 31-33 (concluding that the plain text of the Second Amendment protects the right of Bruen to arm himself in the public for self-defense); *Williams*, 113 F.4th at 649-50 (concluding that the petitioner, a convicted felon with an aggravated robbery conviction fell within the protection of the Second Amendment), the parties here did not address or dispute whether Defendant's conduct is protected. They bypassed the plain text inquiry and proceeded directly to the historical tradition analysis. As an intermediate appellate court, we generally do not decide issues the parties have not raised. *State v.*

---

[9] *Rahimi* involved additional assaultive conduct beyond the incident that led to the domestic violence restraining order, but that conduct was neither necessary to nor relied upon in the Supreme Court's analysis. 602 U.S. at 686-88.

*Bristol*, 654 S.W.3d 917, 923-25 (Tenn. 2022). In *Rahimi*, the majority acknowledged the two-step framework but did not analyze the plain text question; however, both the concurring and dissenting opinions accepted the premise that Rahimi fell within "the people" under the Second Amendment based on the majority's approach. *See Rahimi*, 602 U.S. at 708 (Gorsuch, J., concurring); *see also id.* at 751 (Thomas, J., dissenting).

Defendant contends that historical legal regimes disarming religious groups or racial groups are not relevant historical analogues because their justifications for burdening the Second Amendment do not resemble the rationale of the felon-in-possession statute. Defendant further asserts that there are no historical analogues to felon-in-possession offenses and that the closest comparison would be smuggling, which was not considered a felony and, therefore, not punishable by disarmament or imprisonment. Defendant also argues that Tennessee did not prohibit firearm possession by felons until 2009, a date too recent to supply a founding-era analogue. The State argues that there is a strong historical tradition of disarming dangerous people and although Tennessee's felon-in-possession law does not have an "historical twin," "it fits comfortably within this Nation's historical tradition of disarming the dangerous." A modern statute's recent enactment does not foreclose the existence of an earlier analogue that reflects the same underlying "principle." *Rahimi*, 602 U.S. at 692. We therefore proceed to examine the historical analogues Defendant asserts the trial court failed to consider.

In assessing the constitutionality of Tennessee's felon-in-possession statute under *Bruen*, we draw on the Supreme Court's discussion and analysis in *Bruen* and *Rahimi* concerning the historical "going armed" and affray laws. History shows that those longstanding regulations are "relevantly similar" to modern prohibitions on firearm possession by convicted felons, and it supports the felon-in-possession statute's constitutionality under the *Bruen* framework.

"Going armed" laws were designed to prevent individuals deemed dangerous from carrying weapons in a manner that threatened public peace. *Rahimi*, 602 U.S. at 697. The "going armed" laws were a subset of the "ancient common law prohibition on affrays." *Id.* at 697. Affray laws made engaging in public fighting, violent displays, and "arming oneself 'to the Terror of the People'" criminal offenses. *Id.* at 697 (quoting *State v. Huntly*, 25 N.C. 418, 421-22 (1843) (per curiam)). The origin of affray laws can be traced to the Statute of Northampton in 1328, and they were "incorporated into American jurisprudence through the common law." *Id.* at 697-98 (identifying jurisdictions that incorporated laws against going armed and affrays). The nature of the crime of affrays is an assault on public peace because the regulated conduct was so dangerous that it "almost necessarily" progresses into actual violence:

They attack directly that public order and sense of security, which [] is one of the first obje[c]ts of the common law, and ought to be of the law of all regulated societies, to preserve inviolate – and they lead almost necessarily to actual violence.

*Huntly*, 25 N.C. at 421-22. An affray could occur without actual violence as the court explained in *Huntly*:

[Y]et it seems certain that in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner, as will naturally cause a terror to the people, which is said to have been always an offence at common law and strictly prohibited by many statutes.

*Id.* at 421. The affray laws provide a historical example of a state allowing the disarmament of people who breached the peace, not those who merely possessed weapons or committed nonviolent offenses. In addition to the "forfeiture of the arms," a conviction of an affray law was punishable by imprisonment. *Rahimi*, 602 U.S. at 697 (quoting 4 Blackstone 149).

Drug sales and trafficking, while not necessarily posing an immediate or direct threat of violence, nevertheless puts people and the community at risk and, therefore, can justify a finding of dangerousness. *Williams*, 113 F.4th at 661. Drug trafficking involves conduct that destabilizes communities, invites violent confrontation, and involves the presence or use of weapons. When the presence of a gun accompanies a drug offense, the likelihood of violence increases. *Smith v. United States*, 508 U.S. 223, 240 (1993) (observing that "drugs and guns are a dangerous combination"). "Possession, use, and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.'" *Nat'l Treasury Emp. Union v. Von Raab*, 489 U.S. 656, 668 (1989). This convergence of drugs and guns means that any encounter – whether between traffickers themselves, between traffickers and customers, or during a law-enforcement response – carries an elevated risk of death or serious bodily injury.

Indeed, this court has repeatedly observed the dangerous combination of drug trafficking and firearms or weapons, and the recurring and serious public-safety concern they pose. *See State v. Collins*, No. W2013-01119-CCA-R3-CD, 2014 WL 3510784, at *5-9, 25-26 (Tenn. Crim. App. July 14, 2014) (affirming consecutive sentencing based solely on the dangerous-offender factor where the defendant and an accomplice armed themselves to rob drug dealers, a struggle during the attempted drug transaction resulted in a shooting, and the pair later attempted to destroy evidence by cleaning the apartment and setting it on fire, endangering other residents with both gunfire and fire); *State v. Duncan*, No. W2017-00529-CCA-R3-CD, 2018 WL 1182579, at *1-4, 10-11 (Tenn. Crim. App.

- 14 -

Mar. 6, 2018) (affirming consecutive sentences under the dangerous-offender factor where the defendant, armed while walking in public and mistakenly believing two undercover officers were rival gang members, brandished a gun causing the officers to fear being shot, fled while swallowing cocaine requiring hospitalization, and where the trial court rejected the defendant's claim that the conduct was not dangerous because no one was injured and the amount of cocaine was small); *State v. Blankenship*, No. E2024-00942-CCA-R3-CD, 2025 WL 3200774, at *20-21 (Tenn. Crim. App. Nov. 17, 2025) (upholding consecutive sentences based in part on the dangerous-offender factor where the defendant's drug activity was accompanied by weapons and cartel connections, reflecting a level of danger that required a sentence to protect the public); *no perm. app. filed*; *State v. Pagan*, No. E2012-02210-CCA-R3-CD, 2014 WL 950192, at *6-7 (Tenn. Crim. App. Mar. 11, 2014) (affirming consecutive sentencing where the defendant carried a weapon to a drug transaction to safeguard his drugs and caused the dealer's death in the ensuing struggle).

The historical regulatory tradition reflected in the affray cases is "relevantly similar" to Tennessee's felon-in-possession statute because both regimes are grounded in the same underlying justification – protecting the public peace from conduct that creates a substantial risk of violent escalation. Affray laws targeted the act of going armed in a manner that naturally caused public fear and threatened to provoke violence, recognizing that certain forms of armed behavior, though not violent in themselves, were dangerous because violence was a foreseeable and likely consequence. Tennessee's felon-in-possession statute operates on the same principle. A person with a prior felony drug conviction who unlawfully possesses a firearm engages in conduct which may not inherently involve violence but nonetheless carries a well-recognized risk that violence will follow, particularly given the longstanding association between drug trafficking and armed confrontation.

Moreover, both affray offenses and Tennessee's firearm prohibition are criminal in nature, subject to the same burden of proof beyond a reasonable doubt, and enforceable through the same type of penalty – imprisonment and forfeiture of arms. *Rahimi*, 602 U.S. at 699 (holding that penalty is "another relevant aspect" for examining historical analogue of gun regulation); *cf. Id.* at 770-71 (Thomas, J., dissenting) (reasoning that affray laws are not valid analogues because affray was a criminal offense requiring proof beyond a reasonable doubt and full criminal-process protections, unlike a civil domestic violence restraining order issued without a jury or the safeguards that historically justified disarmament).

We conclude that the affray laws are a valid analogue under the *Bruen* framework and that these shared features place Tennessee's felon-in-possession statute within the historical tradition of regulating armed conduct that threatens the public peace.

Next, we consider whether the felon-in-possession statute and the affray laws impose comparable burdens on the Second Amendment. As previously stated, the felon-in-possession statute prohibits individuals previously convicted of a felony drug offense from possessing a firearm. *See* T.C.A. § 39-17-1307(b)(1)(B). Because this is a criminal offense, the resulting burden of disarmament is imposed only after a conviction, by trial or plea, secured under the beyond-a-reasonable-doubt standard and a full panoply of constitutional protections. The statute is not a general ban on the public right to carry a firearm; rather, it presupposes that the ordinary citizen retains the right to bear arms, unlike the licensing regime at issue in *Bruen*. *Rahimi*, 602 U.S. at 700 (citing *Bruen*, 597 U.S. at 56, which invalidated New York's gun regulation because it "effectively presumed that no citizen had the right absent a special need").

Historical affray laws operated in a similar manner. Like the felon-in-possession statute, affray laws were criminal offenses, and any resulting forfeiture of weapons occurred only upon conviction. In addition, affray laws did not impose a categorical ban on the public right to carry.

We recognize that the duration of the burden differs between the two regulations. Although both imposed immediate consequences upon conviction, an affray law-based restriction was often mitigated by the availability of a surety. Surety laws, whether enacted as a stand-alone law or incorporated into "going armed" statutes, allowed a convicted individual to post a bond and regain the ability to carry arms, therefore rendering the disarmament temporary. *Bruen*, 597 U.S. at 55-56 (describing surety laws as "preventive" measures that operated only upon individualized suspicion and allowed the accused to "avoid" any burden by posting a bond). However, as the State notes in its briefing and at argument, some defendants convicted of a felony may seek restoration of gun rights through the expunction procedure set out in Tennessee statutes or through administrative procedures for the restoration of civil rights on constitutional grounds.[10] We acknowledge that there is a substantial difference between the common-law practice of posting a surety and the modern process of expungement and restoration of citizenship in restoring one's gun rights. The relevant inquiry here is not whether today's restoration procedures are historically identical or equally accessible, but whether convicted felons are categorically without any avenue to regain gun rights. They are not. As with the familiar principle that a defendant is entitled to a constitutionally adequate defense, not a perfect one,[11] the Constitution does not require that modern gun regulations mirror their historical analogues

---

[10] *See, e.g.,* T.C.A. § 40-32-106 (describing Tennessee criminal expunction statute); *see also* T.C.A. § 40-32-107(a)(1)(A)(xx) - (xxxiii) (listing drug offenses eligible for expunction and procedure for seeking expunction); T.C.A. § 40-29-101(1)(E) (defining "citizenship rights" for purposes of restoration to include the restoration of "the right to possess a firearm").

[11] *Denton v. State*, 945 S.W.2d 793, 796 (Tenn, 1996).

- 16 -

in form or ease. *Bruen*, 597 U.S. at 30 (stating that historical analogues need only be "relevantly similar," not "historical twins").

For these reasons, we conclude that Tennessee's felon-in-possession statute is consistent with the nation's tradition of historical gun regulations represented by the common-law affray laws. Defendant's facial challenge therefore fails. .

## As-Applied Challenge

Having concluded that the statute is facially constitutional, we turn to Defendant's as-applied challenge, which requires us to evaluate whether the statute is unconstitutional as enforced against him in light of the specific facts of his criminal history. Here, Defendant argues that *Williams* improperly expanded the as-applied inquiry by examining a defendant's history for indicia of dangerousness. In his view, the Second Amendment does not permit courts to look beyond the statutory elements of the predicate offense. Alternatively, Defendant contends that even under *Williams*, the felon-in-possession statute is unconstitutional as applied to him because, unlike the defendant in *Williams*, his record contains no convictions for inherently violent crimes such as murder, rape, or assault.

Defendant's argument fails because the dangerousness inquiry under *Rahimi* and *Williams* does not turn solely on whether a person has prior convictions for inherently violent offenses such as murder, rape, or assault. *Williams* makes clear that courts must examine a defendant's criminal record to determine whether it reflects the kind of behavior that historically justified disarmament. 113 F.4th at 657-58. This approach aligns with the common law treatment of affrays which targeted armed conduct that threatened the public peace because violence was a foreseeable consequence. *Rahimi*, 602 U.S. at 697-98 (citing *Huntley*, 25 N.C. at 421-22). Consistent with that tradition, *Williams* recognized a second category of offenses – such as burglary and drug trafficking – that lack violent elements but are nevertheless dangerous because they routinely create situations ripe for violent confrontation. 113 F.4th at 658-59.

Defendant's record reflects a sustained pattern of dangerous conduct that supports disarmament under *Bruen*, *Rahimi*, and *Williams*. He has multiple felony drug convictions, including a 2002 Wilson County conviction for conspiracy to sell more than 0.5 grams of cocaine – a conviction that reflects participation in a broader criminal enterprise rather than isolated personal dealing. The judgment for his 2017 Wilson County conviction indicates that a weapon Defendant possessed while selling methamphetamine was forfeited as a consequence of that conviction. Notably, that weapon was distinct from the weapon involved in his earlier 2016 Rutherford County felon-in-possession conviction. Defendant's criminal record also includes probation violations, underscoring a continued

disregard for measures less restrictive than confinement.  And, at the time of the traffic stop in this case, he was on parole for three drug-felony convictions arising in two different counties and was found, once again, in possession of a firearm.  As in *Rahimi*, the relevant inquiry is whether Defendant's conduct demonstrates a credible threat of future armed harm.  Here, Defendant's record supports that conclusion.

It is not lost on the court that, in this appeal, Defendant challenges the constitutionality of the very offense for which he has already been convicted – felony possession of a firearm.  That posture only further weakens his claim.  A defendant who has repeatedly armed himself following multiple felony drug convictions, a prior felon-in-possession conviction, and while on parole, reinforces, rather than undermines, the conclusion that his conduct falls squarely within the category of dangerous behavior contemplated in *Williams*.  Defendant's effort to invalidate the statute that criminalizes the same conduct he continues to engage in simply underscores why the historical tradition has long permitted disarmament in similar circumstances.

Tennessee's felon-in-possession statute, as applied here, fits comfortably within the historical tradition that permits the government to restrict firearm possession by individuals whose pattern of conduct has demonstrated a sustained threat to public safety.  Although the trial court's rationale does not reflect the historical-tradition analysis required under *Bruen*, we conclude that Defendant's as-applied challenge to the felon-in-possession statute fails.  *See State v. Eady*, 685 S.W.3d 689, 708 (Tenn. 2024) (citing *State v. Hester*, 324 S.W.3d 1, 21 n.9 (Tenn. 2010) ("an appellate court may affirm on different grounds than those relied on by the lower court when the court has reached the correct result").  Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

s/*Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE